Kimble v. Davis. I believe that the state of California is actually going first today, is that correct? Your experience as an advocate, you can reserve what you want to reserve. I always say there are no bonus points for using all of your time, so I leave it to you and your best judgment what to do here. You may proceed. Thank you, Your Honor. And just to explain to the Court how I intend to proceed, my intention is to focus my remarks on the state's appeal, which I'll talk about shortly, and to spend maybe about eight minutes, depending upon the Court's preference and what Mr. Evans addresses, both with rebuttal and addressing the claims that the petitioner raises. So with that, I'll turn to the state's appeal. We ask the Court to reverse the District Court's determination granting penalty phase relief in this capital case, in this trial that occurred in 1980. The basis of our position is that, in a nutshell, it is not reasonably probable, rather probable, that the alternative mitigation case championed by lawyers in this long, habeas proceeding was necessarily a more effective one than the case that was offered. Go ahead. In order to make that case, what I would propose to do is first discuss the case that was presented. In somewhat more detail, I think, than it's addressed below, our review here is de novo. So I am not focusing, per se, on the District Court's analysis. I'm focusing on the case that was presented and needs to be compared to the alternative case, which I would like to evaluate next. Let me ask you a question about that because I want to be sure of what you're arguing. Yes. You're not suggesting that counsel chose one case over the other, are you? I am not formally arguing, for example, today, prong one of Strickland. My focus today is on the prejudice prong. No, I understand. Yes. That's why I was – Yes. So you're – we're assuming for the moment, for purposes of your argument, that prong one of Strickland was satisfied. We're assuming it – And your contention is that it's still not reasonably probable that a jury would have reached a different verdict. And just to be clear, Judge Hurwitz, I am proceeding in the interest of time and I think efficiency on the second prong. We have asserted in our brief – I understand you briefed it. That's why I'm asking. Yes, absolutely. And I think one of the things that will shortly distinguish this case from other cases, although, again, my focus is on prejudice, not on the first prong, one of the distinguishing features is the amount of time, documented time, this lawyer spent developing this case, both in meeting with the defendants – I'm going away with one hand when I asked you about with the other. Then I'll go to your observation and I'll move right to prejudice because I think that's a better use of my time. The essential question in this case, I submit, is whether or not additional evidence of the sort that is proposed here would have been helpful to this petitioner under the circumstances where the mitigation case that was presented unquestionably and was unrebutted was that Eric Kimball was – well, first of all, that there was residual doubt as to his guilt, and that's an important component of the argument that the lawyer made, and that is an argument completely at odds with an alternative version of Kimball that shows that he is the product of the disorders and other things that it is claimed. So that's the first part. So you believe counsel was hoping that residual doubt from the guilt phase could cause at least one juror to vote not to assess the death penalty because of that uncertainty. And it's not merely my hope, Judge Bennett, it's what the lawyer is telling the jury in summation. He is reminding them of the doubt that they should have about who was there and what Kimball did or didn't do. But if he had had a choice and you're not focusing on that, that that would have influenced the choice, if he had had a choice to put on this alternative case. Right. But as far as the prejudice aspect of it, so it adds into the equation the component of doubt. That's number one. But more importantly, the portrait of Kimball that comes not from a lack of – well, not because there are not steps made to explore and evaluate. But the portrait of Kimball that emerges in the penalty phase is of a loyal, trustworthy, devoted, interested, motivated young person who is active regularly in reinforcing children in the neighborhood, coaching children in youth sports, watching children as a caretaker in lieu of parents. What weight are we to put on the fact that this defense failed? I mean, it was – again, put aside the strategic decision issue. We know this defense failed. We know. We know that – we know there was an alternative one because we now have discovery and an evidentiary record. So I guess I'm trying not to lapse back into the strategic part of the case. We now know that that defense was not reasonably probable to lead to a different conclusion. Why should we conclude that this one wasn't simply because that one failed? Well, the fact that it failed does not mean that it's reasonably probable to fail. It means that it failed. And what it means in the context of this case, though, is the question is whether or not the failure is attributable to the lawyer. So, for example, when we look at objective indicia of the dynamics of this presentation, which not only insulated Kimball from all of the sort of negative information and damaging information that would emerge in an alternative case. Well, counsel, let me push back a little bit on that. The prosecutor decided not to put all that on or not to put any of that on, but I'm not sure that the decision to go that way insulated the petitioner from that because it's not clear to me that the prosecutor was precluded from the rape stuff by the superior court judge. But none of the rest of this he was precluded from doing. He could have done it. He could have at least tried if he'd wanted to. So defense counsel didn't know in advance, right? But in terms of the prejudice component judgment, my point is simply that we know that he was insulated as a factual matter, meaning it didn't come in. It didn't come in, yes. Now, so not only did it not come in, but to the question of the effectiveness of it, one can be effective, right, or ineffective in the sense of a result without being ineffective in the meaning of Strickland. So we know that. Well, see, now, again, you're perfectly free to argue the first prong of Strickland if you want, but I must tell you, I find that your argument on the first prong of Strickland much more difficult than I do on the second prong. And every time you say one can be effective even though one doesn't put on evidence, you're now talking about the first prong of Strickland. And my apologies, then, Judge Hurwitz. My intention is to focus on the outcome. So when I talk about prejudice in this context, what I'm saying is that, for example, it is relevant, I believe, that at the conclusion of that case, right, which is six witnesses, which is far more than the cases that are generally catalogued, where there is virtually nothing presented or something that is only banal and cursory. This is six witnesses discussing what I have described. We know that the jury goes to deliberate, and we know that the jury deliberates over three court days for a total of approximately 11 hours. So in terms of the effectiveness of the case, not the lawyer, on the prejudice prong, to say that that jury is not ---- Could I take something different out of that? Sure. The jury is out for three days. On the second day, it comes back and says, what should we do if we're hung? It doesn't say we're hung. Correct. And then it comes back and says, Judge, we'd like additional guidance, if you can give it to us. And the judge, I think probably correctly, says, no, I can't. When I think of a reasonable probability of a different outcome, am I thinking of this jury or some hypothetical jury? The question is an objective one. It is not ---- No, I'm not worried. If this jury came back and said, Judge, can we consider the mental health of the defendant, and the judge said, no, you may not, would we then say, well, it really doesn't matter because a reasonably objective jury wouldn't have asked about that? Well, I think it's one thing if a record affirmatively indicated that there was a question or a concern about a particular aspect of the case. I think that's different than the question you're posing generally. Well, what I take from this case is I see a jury struggling with a very difficult job, as horrific as this crime is. The defendant was 18 years old when he committed it. Yes. They're having a hard time. I mean, it's apparent. And, you know, you've got experience with these, and so do several people on the panel. Having a jury out for three days and asking questions before he gets there shows that they're struggling. And this jury was struggling. So I'm trying to figure out if this jury had more information. And ---- How would I know that they would reach the same outcome? And my point vis-a-vis the reasonable probability standard is the question is whether or not it is fair to infer from that struggle that they're struggling because of a deficient lawyer or they're struggling because they now have a real battle or a real question as to the appropriate penalty. But let me posit perhaps not an alternative universe for you, but it comes from some experience. Juries often come back and say, this kid had no excuse. He came from a good family. He was church-going. He had a good record. Somebody like that who commits a crime must have done it with the most evil of intentions. And what we now know is that he had a minimal IQ. He had a fair amount of mental health issues. I'm not going to summarize all the evidence that came out. Why shouldn't I infer that a jury who knew that might say, let's give him life? What is it that helps me make this reasonable probability determination in this case? We know that so as the court points out, Judge Hurwitz, as you say, a juror might decide that, no, this is actually someone who is extraordinarily culpable and whose culpability, notwithstanding the fact that the crime is committed at a young age, warrants this extreme punishment. Now, the question is whether or not, on a reasonable probability, not a possibility standard, of course, is it possible that a juror would? But it's not more probable than not. By the way, I have no idea what a reasonable probability is, but that's a separate question. The two terms together don't seem to make any sense. But we know it's less than 50 percent, but not minimal. And we know that it's more than a possibility. And we know that it must be demonstrable. So what we know in this case, under the circumstances of this case, are that, again, I will contrast this with a case in which there is virtually no mitigation because to describe this case as no mitigation, I submit, is unfair. It is a type of mitigation, and it goes only one way, and there is no rebuttal. And the portrait is that he may not be fully responsible for this. He's 18 years old. This is a barbaric penalty to visit on anyone, much less a child, and that it is a sufficient punishment for someone who gives no inkling of this to imprison him the rest of his life, 50, 60, 70 years in prison. That's the argument that Walton makes. Now, if we credit the alternative case and, as you indicate, the other information comes in, then what also comes in, because we are now assessing not what this prosecutor did, but what could happen, what comes in is the portrait, cumulatively, that can emerge of Eric Kimball. And it is not fair to say, for example, it is not accurate to say that there is any diagnosis of any profound disorder. You reference the IQ. The IQ is described as low normal. This is a crime of extraordinary planning. It is an almost bizarrely planned crime to target this couple to invade their home just to gain keys to a store. What is also avoided by the strategy that Walton uses is – Again, don't – strategy takes me back. You're right. He had no idea that this information was available. Okay. By the way this evidence was presented, right, there is no discussion of what the forensic psychiatrist who was not retained by Kimball says is a map of 36 either criminal or violent or bizarre acts, all of which involve victimization, starting when he is 12 years old and continuing virtually every other month for six years until he commits the murder. Now, is it possible – Can I ask you a question about that? Yes. And we're always operating in an alternative world when we look at these. Yes. Do we – how do we know all that information would have come in in the prosecution's case? We don't. I mean, we don't have what we might have in another case as a proffer and a judge saying, well, I'd let that in, but he didn't raise it, so I'm not going to let you raise it. It is to a large extent a speculative inquiry on both sides always. But we know – it's fair to say that at a minimum it would open the door, and that is why, for example, the case that I cite in the 28J letter, which is not unique. It's just a recent example of this. The Sergio Ochoa case talks about the mixed bag, the double-edged sword. It is certainly California's position here, though, that if this defense had been put on, that we should find, like the district court did, that ASPD is definitely going to be in play, right? Absolutely. And with respect to ASPD, that is the assessment of antisocial personality disorder, no one rules that out in this case. No one rules that out. That is – Well, one of the doctors that they proffered did based on something that happened after the trial, right? Didn't one of their doctors, Dr. Dunn, but I might have that wrong, say, he can't have ASPD because he didn't go after the person who murdered his sister? She refers to that. I think that's of questionable weight. She does say that. She says that. But the important point, by the way, is not necessarily whether or not there would have been a consensus or unanimity about whether or not he is ASPD. The point is that there is a consensus, that there is a basis to decide that he is a sociopath, that he is a psychopath. And that assessment specifically is described as the basket of cobras in cases decided by this court. So to say that a lawyer is obligated to produce that information, and if there were compelling mitigation in this case, that would be one thing. What is the mitigation? As I mentioned before, there is no identification of him as less than below average intelligence. It's low intelligence. The implication is that that's why he leaves school. He leaves school. He leaves Hamilton High School because he's selling drugs. So he's barred from Hamilton High School. He ends up at Palisades High School. He's selling drugs to an undercover police agent. So the school performance is not because academically he is floundering. And even if it were, there is no documented relationship in this case at all between any of the assessments of him psychologically and these crimes. So, for example, if he says their strongest opinion of him is that he's, well, first of all, the IQ, which I think takes a very strange view of why there is a relationship arguably between IQ and the commission of murder and rape. That, to me, is a very questionable premise without an extreme IQ number here. But beyond that, their primary assessment of Kimball is that he's ADHD, that he has excessive energy. There is no recognized correlation anywhere that I'm aware of, certainly not in any case that this court or the Supreme Court has ever decided, why attention or hyperactivity would be mitigating in terms of rape and murder. And whether there is now or not, we would be looking essentially at the DSM-III for that, correct? We would. We would. And we would be looking at the penalty phase standards, prejudice, not performance, that were extant in 1980 when this case was tried 42 years ago, not the development of the sort of mitigation mentality, if you will, that has emerged since then. But even if this were a 1980 case, right, I would suggest to the court, whether it's the Bean case, the Correll case, the Caro case, any of the many authorities of this court, not to mention the U.S. Supreme Court statements, where what is truly described as mitigation is remotely comparable to a case in which, as the jury heard, this is a family living in middle-class circumstances. It is an intact family. They are described under oath as a close-knit group. If the reality is radically different than that, which it's now suggested the reality is, according to them, that no, notwithstanding the fact that the father is described as the caregiver or the provider of this house and they've improved their circumstances and they've gotten to this middle-class neighborhood, he's a drunk. He uses strict corporal punishment. And all of the siblings, the loving family that this jury is told is the backdrop of Eric Kimball that renders these crimes unimaginable, that family's a bunch of crooks. That's their argument. There's a rap sheet for every sibling in this family. So getting back to— Well, but I want to go back to what defense counsel said when he tried to persuade the judge to not have the death penalty argued. He said, this is a really hard case because I don't have any of that stuff. If I had that stuff, this would be a better case for me. But I don't, so I'm forced to rely on this Manila stuff, and, you know, I'm disadvantaged in this case because of that. But Judge Hurwitz, at the risk of me wandering back into the first prong—right? So I'll try not to do that. At the risk of that, and in deference to Mr. Walton, and, of course, Strickland is largely about deference. Again, I'm going to stay away from performance, but we don't know any of that. He passed away years before this habeas became active. There's no indication beyond that. So regardless of what he thought or he investigated— But it is in the record that the petitioner's relatives said that even those who were interviewed, that he didn't ask them any of these questions, right? Isn't that in the record? The testimony is that, to paraphrase what the court is saying, I don't disagree that these questions were not asked. I'm simply saying, vis-à-vis 1980 conversations that were recollected about 20-plus years later, we don't know. But regardless, let's assume he didn't ask and should have asked. The question is, getting back to the focus of this case, why is it reasonably probable? Is it possible? Why is it reasonably probable that with the dangerousness of that kind of extraordinarily violent and criminal pattern, this is not a case where, for example, whether he'd ask questions or not, this was not the sort of squalor or severe abuse that the court refers to in other cases. But, again, the important difference is that in all those cases, I would submit, all the ones that come to my mind, the comparison is between nothing and what wasn't developed. The question here is whether or not, not in terms of the performance, whether or not assessing the case, is it reasonably probable that a case that would have inevitably, they don't dispute this, the district court didn't dispute this, would have opened the door to that amount of aggravating information, which is extraordinary. I think the court would. I think what the district court said is, even if the direct evidence doesn't come in, the evidence is going to come in in terms of the evaluations of the mental health professionals, talking about why they got to ASPD. And that is correct, Your Honor, although the district court at one point says in the summary that no mitigation is presented. Again, I think that completely short shrifts what was. But not only were these ominous diagnoses potential. If you look, for example, at Dr. Lanyon's report or assessment, now this has nothing to do with whether Lanyon evaluated Kimball face-to-face because the district court sort of distrusts him for not doing that. I'm not talking about that. This is a board-certified forensic child psychiatrist, right, honors graduate of UC Berkeley, a graduate of the Yale Medical School. He has done a few of these cases, and he describes Kimball in extraordinarily negative terms. He finds no support for virtually any of these assessments. But what he notes, and what is always soft-pedaled in this case, what he notes in particular, I submit, is that prior rape. Can I ask you a question a little bit off course, and I will understand if you tell me you can't answer it. Yes, this is going to be my question as well. The state has appealed the district court's granting of the red S to the penalty. Yes. But we know, because we're all knowledgeable human beings, that the state is not executing people. You don't get to make all those decisions. Why should we decide this case at all? Why shouldn't we wait until the state indicates that it wants to resume executions? This is, as you suggest, a difficult case with a big record, and you're asking us to take it on in the context of it probably making no difference at all with respect to penalty. This is more frustration than a question, and therefore if you say, Judge Hurwitz, I understand, but I can't tell you the answer, that would be a terrific answer. But I wanted to express that frustration. Which I share. I understand the court's perspective on the case, and as one that works in this area, I'm somewhat familiar with it myself. Having said that, the question in my role as the advocate is whether this is the correct result and whether the appeal is. You apparently made a decision that it's worth bringing the penalty issue to us to change what you think is an incorrect result. Yes. And therefore you made that decision, you the state. You are not the state of California. You merely represent them. You made that decision in the context of knowing that realistically there's never going to be an execution in this case. That's my concern with the court's time. I understand, and mine is that I need to save some rebuttal as well. I'll give you flexibility there. I guess my question, and I would phrase it this way, is that it would be one thing if Mr. Kimball were appealing the denial of his claim to try to get out of the penalty phase. I get that. And I get why you would want to defend that. But here, the state is actively appealing, asking us to give it permission to do something that the governor says the state of California will not do, and physically remove the equipment from San Quentin. We don't usually get cases like this. And so I want to ask the same question here. What are we doing here? Well, so, again, although I have a limited role simply as a lowly advocate for the state, but the fact of the matter is as to that sort of more, pardon the pun, existential question, there are regimes. And I don't know in the future what will occur, but when a decision was made on a professional level that a result should be challenged, it was challenged. So that the outcome of this case will be decided, obviously, by the merits of the case, and then the appropriate people in charge will decide where to proceed. But I think the question was when the case was evaluated and relief was granted, which was some time ago, and when the appeal was initiated to proceed. So whether or not there should be a halting of all sorts of things, again, that's way beyond what's briefed in these cases at my level. Understood. But since there is a chain of command, one of our jobs is to ask you, or my job is to ask you to report it up the chain of command, and perhaps we can get a more coherent answer as to why we're doing this. This has nothing to do with you, Counsel. I appreciate it, Your Honor. But, you know, we like to decide cases where there's going to be a result that will be enforced. Yes. And this is not one of those cases. And I would just add to that, if I may, that having at one time in my life been in the position of somebody who is up in your chain of command, I would also suggest that might be worth a discussion. So noted, and I will certainly report back. And, of course, nowadays there's a souvenir of these cases, so it speaks for itself. Yes, absolutely. I have very little time remaining. So let's do this. We'll go ahead and stop the clock.  We ate up four with our pontification. I appreciate it, Your Honor, and I'll see you again. Mr. Evans. Good afternoon. My name is David Evans. I'm appearing on behalf of Eric Kimball, appellee and petitioner. The court turned to a question that I wanted to begin my comments with, was the comments on January 6th by Mr. Walton. When you said January 6th, that's a different connotation. The date is not important. Well, it is important in the context of the chronology of this case. Fair enough. Okay, so January 6th in the 80s. 1980. Okay, thank you. I apologize. But as the court has noted, he stood up in front of the judge and says, You know, I know the standards. I've been to seminars. I've read the cases. I've tried cases. I'm supposed to put on the most effective case I can put on, is a case of abuse and neglect. I don't have that here. But how does that help me on the reasonably probable question? And let me sort of outline my difficulties with the case, and maybe you can help me with it. This is not an AEDPA case, and I think a judge could reasonably determine that the second prong of Strickland wasn't that, a state judge. But we're reviewing de novo. We're trying to figure out how I would decide the case if I were the state appellate judge. And so tell me why counsel's reservations make my job any easier in that area. In other words, the question I think your colleague has posed quite accurately is, in this counterfactual world that we now have to live in, had this information been presented to the jury, how could I determine that it's reasonably probable that they would have reached a different result? Well, contrary to counsel's representations, I think that the presentation that could have been made here was a very dramatic one. Mr. Kimball was raised in the home of a drunk. He was beaten by belts, by shaving belts, which I haven't seen one of those for a long time. He was neglected. He was, by the time he was 11, I think, he was using serious drugs. He was always stoned. The juvenile records, which Mr. Walton never bothered to obtain, reflect a series of arrests for drugs, not only possession and distribution of pot, but also of PCP. He was using it constantly. He told his teachers he couldn't make it through the day without it. It's on that basis, I suppose, that Dr. Lippian, I believe that's his name, concluded in part that he was, under the DSM-III, was an antisocial personality disorder because of those many minor infractions leading up to this awful... Well, there were more than minor infractions in his record, if credited. The rape was a serious case. Part of that, my recollection of looking at the file, that they were not serious. There were burglaries and they were selling PCP. Yes. So, I mean, they are what they are, however one characterizes them. And, of course, the rape was, through the court, resolved as an 18-year-old under the age of consent. That was the plea agreement. That was the plea agreement. The girl's claim was different than Mr. Kimball's claim. Right. And the prosecutor agreed to that disposition, and the court accepted it. The scope of the mitigating evidence they could have presented was extreme. I mean, if you look at those school records, time and again, there are comments about failure to provide basic medical care, failure to provide basic dental care. Looking at school records, dental care turns out to be a very revealing factor because it's the kind of thing that's neglected by people who don't care. Counsel, let me put out there what my most basic problem with your argument is. The DSM-III talks about specifically, for example, it describes antisocial personality disorder as personality disorder with predominantly sociopathic manifestation and talks about what sociopathic means, which is basically someone who has committed all of these antisocial violent crimes and will be doing so for the foreseeable future well into adulthood. What defense attorney, cognizant of the stakes, would risk putting that on? And if they did risk putting that on, how does the jury here, thinking of your client as a sociopath, per the DSM-III, how does that make it more likely he's going to avoid the death penalty? That's my basic problem with your argument. I believe it's in the context of how that is presented. DSM-III was an allegation, was a diagnosis that could be challenged based on breaking it down on its particulars. Often it involved evidence of leaving home, running away from home. Can you imagine a home where a child would be less likely to run away from than the home in which he was raised? Mr. Walton stood up and said, I have a very good home. I'm putting on a different case. They're God-fearing people. The kid goes to school regularly. He goes to church regularly. The kids are all going to college. Well, the kids all went to college, but there was a college of men's central jail. Every one of them was in jail or in prison. Drugs are rampant. Mr. Kimball took drugs because he was self-medicating. I mean, it's astonishing the horror that was going on in that household. It's impossible. But he wasn't just taking drugs. He was selling drugs. He was selling drugs. That's what kids do when they've got them and they're around. He thought he was a cool kid because he was a stupid kid. Can you imagine? This is an inner city kid from that background who's transferred on buses to Pally High School. Do you know how out of place that kid was there unless he was selling drugs? He was the sole access. That was some status of his personhood. Of course it was. It's not a good thing. This stuff comes up. When you introduce evidence of that kind of trauma, there's always kickback. An antisocial personality by a doctor who had never examined him would not have been admitted. It was against the very guidelines of the profession. But as the district court said, that really wasn't the issue. The district court was dealing with the issue of whether antisocial personality disorder would have likely come into the trial, and the district court said, given what the testimony was of all of the mental health professionals, not just Dr. Lippian, that he accepted that that was going to come out and that that was the choice the defense counsel was going to have to be faced with. Right? It's one of the very few things. There are several others which I disagree with the district judge on. I'm not sure that it would have come in. And if it came in, I'm sorry. But we don't know, right? The difficulty is, it's not just whatever the State had in that form that would have come in. Had the door been open to this diagnosis, presumably they would have had somebody examine Mr. Kimball and Mr. Kimball and he would have testified. So I'm not sure we can restrict the State to whatever it had in hand at the moment. I think that's right. The court, I think, is correct in that. We can't know. But to ameliorate the situation which Mr. Walton placed the defendant, you have to have a tactical decision, a decision that I know these facts are there. But, again, that's why I'm starting off with both sides with the assumption that trial counsel fell below the first prong of Strickland, which is to say he provided performance that was not up to the level that should have been provided. The question is, had he done better, how can I conclude that it's a reasonably probable that a different outcome would have occurred? And I want to ask you a question about that, and it stems from my ignorance about California law, but my rereading of the briefs. This is a terrible crime. But the jury is not instructed to weigh a crime against the mitigators, is it? No. So it's just being told he's now death eligible, and now you should determine whether there's sufficient mitigation. Not even sufficient. It's to consider these. Well, okay. But am I right in thinking that at least as instructed, the jury is told that it shouldn't consider the gravity of the crime once the aggravator is? Well, they are instructed, I believe. My recollection is that they were instructed in this case to consider the facts of the crime. The facts of the crime. Okay. So even though they're not supposed to weigh, it's an awful set of facts. That's a terrible set of facts. When I try to think about whether a jury was reasonably probable to reach a different outcome, and I think a different outcome, by the way, is a hung jury, as opposed to a life sentence. When I look at the facts of this crime, how do I weigh them into the equation? Well, I think the question is what is present in every mitigation case. You say, what led us to this? What terrible accident brought us here? Let me give you a contrary example. In the state I'm most familiar with, the juries are told you should look at the mitigation, you should look at the aggravation, and you should engage in some sort of weighing. It's not balancing, but weighing. And if the facts are just awful, then on that side of the scale, the state has a fair amount of weight. What do we do in a case like this where the facts are, at least on the surface, in credit? This is not an ordinary murder. This is a double murder done for profit and involving a rape. I understand you contend the evidence wasn't sufficient, but assume for a moment it was. We've got all that on one side, and now we're saying, gee, had the defense counsel only presented to the jury this other evidence, it's reasonably probable a different outcome would occur. It's a very difficult question for me, so tell me how I reach the answer to that question. Fundamentally, I think we talk about it as two separate trials. You have a guilt phase. You have a determination whether special circumstances are present, and then you go into a trial where the decision is life or death, and that is a separate trial. It begins only after this. Right, but that's why I asked you how the jury was instructed, because if in that separate trial they may consider what they learned in the first trial as part of their calculus. Plainly they can. Plainly they are allowed to. But plainly they know, if it's argued properly, that they wouldn't be there at all if there hadn't been that prior determination. The question then is not, was that awful? You wouldn't be here. There wouldn't have been a finding of a special circumstance if it was here. But that does not preclude mitigation. Once you have the guilt phase and the special circumstances, you're in a unique position. You're determining life or death. But I think, I don't mean to step on Judge Hurwitz's question, but my variant of that question would be, given that and given these horrendous facts, why does what you argue should come in with what would have come in with it, why would that have been likely, whatever the test is, to move the needle here with the baseline that you have to start with of these horrendous murder-rape facts? Well, I think the first answer is simply that what we had was nothing. We had the church-going kid who did this awful stuff. He must be the demon's son. That it's inconceivable that a normal person would do this. He must be a bad person. Look to the government's argument in penalty phase, in guilt phase. It's an extraordinary document, which even the California Supreme Court says has no basis, but it's the one that the jury heard. He planned and plotted this thing by himself, that he was seeking revenge. There's no evidence of that, but that's what they heard. If you don't come back with an explanation of why he's there in some meaningful way, then you're going to get the verdict that you did. The only way, and you're going to risk it if you need to risk it. Dr. Lipien, by the way, in describing antisocial personality disorder, said what we understand, the origins of antisocial personality disorder, depends on the care received as an infant. That the difference between a sociopathic killer and a jet pilot or a war hero is simply the attention they received as an infant. That was his testimony. I don't recommend, as a defense attorney, taking antisocial personality disorder as a defense in putting on a case, but that was what the evidence would be if you're using Dr. Lipien as your expert, as Respondent did in this case. If you don't put something on and you make a... I suppose that Mr. Walton thought he was Clarence Darrow. He gave a closing argument in the penalty phase that the death penalty is bad, it dehumanizes each of us. Well, that was a very effective argument in the early 30s for Mr. Darrow, but that was not addressing a jury which had been told, you must impose a death penalty in an appropriate case. That's the initial instruction. Although I don't know if you're talking about the Leopold Loeb case. Yes, that is his argument. It worked. It worked because the jury had not been instructed in the appropriate case. That instruction was not given in Leopold Loeb. But why is your friend wrong that leaving the jury with the impression that maybe this young man didn't do it, he's a good young man, he takes care of adult neighbors, he's a good babysitter, that that would lead to one juror saying, we, the jury, should not take the life of an 18-year-old. Why is that nothing? Well, beyond the obvious response that it didn't happen. Well, yes, we know it didn't happen. Is there a case against which we can measure? Yes. And the answer may be no. There is language that's replete throughout. No, there's lots of language that says this is mitigating evidence and a jury should be allowed to hear this mitigating evidence and we're operating from the presumption, at least for purposes of these questions, that counsel was deficient in not presenting it to them. The thing that gives me trouble, and you may not be able to solve it for me, I may just have to decide on my own, is how do I determine then that it's reasonably probable? In other words, if one of the witnesses had said, he was clinically insane at the time of the crime and there was no rebuttal, I would say, my gosh, that would have made a difference. But here it's not quite that. It really does describe a very troubled young man who's committed some terrible crimes. So why is it reasonably probable, had the jury known that, they would have come back with a different outcome? Well, as the court... And I may be asking you a question that no one can answer. Well, there is language throughout the case law and capital jurisprudence talking about this is the sort of defense, the mitigation presentation that is presented and works. There's a quote in the... Tell me what case says it works. That's the one I couldn't find. I don't have it. I found lots of them that said, sure, this is relevant, and the jury should consider it when it's presented. I don't know what... And you have more experience in this area than I do, but I have some, and I've never been sure about what works. That's what I'm asking. Well, I think one indication of what works and what doesn't work, and it doesn't go directly to your question, but let me try and get to it. The respondent quotes in its supplemental reply brief dicta in N. Ray Andrews to the effect that they're talking about the mitigation case presented in the early 80s, and the court says that this is unusual, that asking a requirement that a comprehensive mitigation presentation of the horrors suffered by the defendant is unusual in the cases we see. Now, they're talking about the cases at that time. My response to that would be twofold. One, obviously this court, or some of the judges on this court, reversed N. Ray Andrews. But secondly, that court is talking about cases that go before them that failed. The cases that go before this California Supreme Court on death penalty cases are cases where the jury returned a verdict of death, and those are the cases that don't show much presentation of mitigating evidence, of comprehensive mitigation evidence. Now, that's a reverse answer to your question. Yeah, I know. I know he couldn't have done worse. I know counsel couldn't have done worse had he presented this evidence because the result he got was the worst result he could get. What I'm trying to figure out is how I can tell whether he would have done better. Well, I'm not a witness here, Your Honor. Yeah, and it may be an unanswerable question. By which I mean I've tried these cases, and when you put on those cases, you prevail. Even the jury sworn to accept the death penalty. There's a reason that they were talking in the seminars that Mr. Walton attended that this is what you put on. The court record going back to Lockett and Eddings. Is that one way to look at this case? I must say this case has been extraordinarily well briefed and argued on both sides. I sort of have a rough feeling in my mind that had you been Mr. Kimball's lawyer, he might have gotten a different result. Is that the measure that I use in this case? On the other hand, your friend wasn't the prosecutor, so maybe the balancing would be much harder. But the point is that another lawyer could have done that. If a lawyer presenting that evidence had a good likelihood of talking about the circumstances of a man's life, not in terms of standing up and saying, you dehumanize yourself by executing them, but by saying this is a person. The whole point of a penalty phase argument is almost humanistic. I mean in its purest form, you're talking about somebody who you've decided has done something terrible, but there is meaning to this person's life. You have to give meaning to that life. Simply saying he's a good kid, he's a church-going kid, doesn't cut it. It's not enough to stand up against the awful evidence you've described. Talking about how that person got there and the forces which brought him there makes that person real and credible to the jury, and they can then give dignity to life. It's not an acquittal. No, I'm talking about, as I said, I think a different outcome means not the death sentence as opposed to... And I think it's important to focus on a hung jury in this case because we're talking about the 1977 statute. We're talking about one person. And the state has conceded that. It seemed worth repeating. Can I ask you the question I asked your friend? Because I'm not sure I still know the answer. Do I look at this jury subjectively, or do I look at the hypothetical reasonable jury? I think you have to look at the jury that was before the court. I mean, I... What case tells me that? I don't know. I know there are cases, for example, where you've said we take into account that the jury asked questions or that it took a long time. Well, that was... I think they say that implicitly, but I'm trying to find if there's a case that says that expressly. Perhaps counsel knows I don't. If there's any other questions the court has, I'd like to save it for rebuttal, if I may. Or is there rebuttal? Yes, we'll stop the clock because you can do rebuttal as to your arguments. Well, actually, let's take a second. You actually have not argued any guilt phase. So for me to grant you rebuttal has to be on to the guilt phase. Do you want to make a couple comments on the guilt phase? And then I would allow you to have rebuttal. Because you have to actually rebut what they're going to argue in exchange. To the extent that counsel is going to be arguing the guilt phase, I believe that...  This whole case, our whole case, our whole argument, is the failure of defense counsel to investigate the case. Some of it obviously had been established, and Mr. Walton acknowledged this, that others were present. If you'd been able to establish that, that others were present, it would have been impossible for the prosecutor to make the argument that he did. And it's because he was concerned about that, I believe, that the prosecutor did make this preposterous argument that he did. Is that a guilt phase argument or a penalty phase argument? I'm talking about guilt phase as well. I know, but so it seems to me even if others had been present on this evidence, it seems to me he would have been convicted. But he might have been viewed as less culpable at the penalty phase because somebody else had done something. I think that's true, but also under the 1977 law, you either have the present and the killer or aiding and abetting of a specific intent to kill. There's no way you could reach that conclusively on the special circumstances. I'm not talking about... I'm including special circumstances in guilt phase. I'm making that... Well, if the special circumstances... See, special circumstances to me here that's incontestable is multiple murders. I'm sorry. The incontestable special circumstance here is multiple murders. We know two people died. So I'm trying to figure out why proof that a co-conspirator was present at the time would have been helpful in defending against the special circumstance or the guilt verdict. I understand why it might have been relevant at the penalty phase because maybe he wasn't the person who actually did it. But how would it have been helpful at the guilt phase? Well, unless there was specific evidence that he was present and did the shooting. Well, no, you don't need specific. You just need evidence from which it can be inferred. It has to be inferred that he was aiding and abetting with a specific intent to kill. Right, but you're not contending on this record that the prosecution's case taken in the light most favorable to the state wasn't sufficient to establish his guilt. No, I'm not. What I'm doing or attempting to do is to include and this isn't what the court was asking, but I'm saying that part of the characterization of guilt phase is a determination of special circumstances, and the special circumstances required this. I understand your argument. And had other defendants, other individuals been present, it would have been a much harder. Then you're talking about life sentences. Counsel, give me your best response or your best individual piece of evidence as to why the district court was wrong when the district court said, basically, even if you could have overcome all of the problems with admissibility, the district court talked about what evidence of accomplice involvement would the jurors have heard, and the district court concluded that this was slight evidence that would have only slightly moved the needle. What is your best example of admissible evidence that could have moved the needle on accomplices being involved at the scene? Well, there's a critical piece of that, and I don't know if it's the best. I think it is very interesting and very strong. You'll recall that the defendant was identified as running down from the house, down the hill, down Nightingale Avenue to Doheny at 1.30 in the afternoon. He was seen in the bushes by Mr. Dietland, a neighbor, who said, finally identifying him in court after having trouble identifying him under prior circumstances. He ran down the hill past a woman named Notary Shane. He was at the corner of Nightingale and Doheny. And he saw this young man coming down. She couldn't see him identifying that clearly, but it was the same build as a nephew, and she thought it was him. He continued to run down the street, and shortly after she saw a small brown car speeding down the hill and coming to a screeching halt. In that car were two black individuals. There had been testimony that blacks were seldom seen in that neighborhood. Now the prosecutor asked, were you able to see the persons in the car? She said, well, I couldn't identify them. What race were they? Black. And then he asked, could you see them? He, the individual running down the hill, jumped over a low rail down a hillside, which ran into Doheny below. It was a hairpin turn. He said, were you able to see that individual after he jumped over the rail? He said, no. Were you able to see that at all? No. At that point, he was cross-examined by Mr. Walton, who does, I would suggest, for somebody who had not prepared a case, quite an artful job. It's the kind of job you do cross-examining a witness where you're very careful about your answers, how far away, what colors, distance, the kind of thing that you learn trying misdemeanors as a public defender. Very, very careful, and very specifically not asking the one question, did you see that individual get in the car with the two other defendants, with the two other men in that small brown car? He didn't ask that question. He was subsequently interviewed, Mrs. Shane was subsequently interviewed. She died before the hearing and was never deposed, but he was invited by an investigator to whom she said, I saw him, he got in the car. The district court discounted that, right? The court, yes, it discounted that. The court discounted that. The court discounted that because Judge Wilson assumed that she had testified she couldn't see anything, she didn't see him get in the car. That was not what she said. She didn't see him jump over the rail. Had he interviewed the witness beforehand, Walden had not interviewed Shane beforehand, he would have asked that question because he would have had her answer, but yes, she saw him get in the car. Then you'd still have to convince us that had that evidence come in. It's true, but... There's a reasonable probability. Just two hours before the breaking and entering into the house, that seems to me very strong evidence, and I don't think Judge Wilson gave due credit to that. He went with a very narrow reading of the question asked by the prosecutor, but Walden's cross-examination, if you look at it, is very careful. He didn't know what the answer was, so he didn't ask it. He didn't ask, did he get in the car with the other two black men, because he didn't want to know, he wanted to be able to argue it. But had that evidence been presented, I think we'll argue that's very strong evidence that other individuals were present during the robbery, that they were facing the place, that was the prosecution's argument, and more than one person went in. All right, thank you. We'll go ahead and give five minutes for rebuttal. Thank you. Thank you. I will talk very briefly about the guilt-faced claim because, well, A, I want to be responsive, and B, it does lead me to the same issue that we are discussing, primarily the penalty-faced claim. In 30 years of habeas corpus litigation in the federal courts and in the 10 years or so before that in state courts, there has never been an identification of anyone who specifically was in that home when those murders and that rape was committed. And so that's the short answer as to why nothing is there. Mr. Kimball's fingerprints were in the home. Not only are his fingerprints there, but as we later learned, his DNA is there. Right, and there's no explanation offered by the defense of why his fingerprints are there. None. And obviously... Nor do we have one now, even. But the additional determination that his DNA is discovered... Is that relevant to us? Well, it confirms... It's relevant if this were an actual innocence case, to be sure. But, I mean, can we... You know, it's funny. Let's assume there were no eyewitnesses at the time or there was an eyewitness who said he didn't do it. And now we now find out the eyewitness was lying. I'm not sure that we would say counsel shouldn't have put on the eyewitness who said he didn't do it. All I'm saying is that the theory that was presented, that in addition to murdering Hogtong and murdering both of them, he takes 61-year-old Yvonne Margulies and rapes her in her son's bedroom, that is confirmed by the DNA. And that's only Kimball. Counsel, isn't at least partly your friend's position that a possible explanation for Mr. Kimball's fingerprints inside the home were that he was involved in drug dealing with the son, and for that reason his fingerprints might have been in the home if that were true? There is. Is that an extraordinarily remote and speculative claim in light of the fact, for example, that William Margulies, the son, who is identified in this totally speculative theory with no one providing any percipient, non-inadmissible hearsay claim about any of this. William Margulies says, I don't know what anyone is talking about. I don't know these people. I've never been to that high school. So the whole theory that he is this phantom drug dealer with whom they are interacting, that's based on nothing. But the point I wanted to make vis-à-vis the overarching point is that Mr. Walton takes that, just as they are, without any evidence. He takes that, and he makes that a component of that penalty phase argument. And the penalty phase argument in total is not just that he went to church, that he didn't kill anybody, and you shouldn't kill him. The argument speaks for itself. The evidence of the six witnesses speak for themselves. It is unlike any case, I would submit, where this court has said there is no mitigation. That is why it is not fair to refer to it as either none or banal or cursory. It was a mitigation case. And counsel says, in his role as an advocate, of course, that there are explanations for this. But to say, that is, there are explanations for Eric Kimball turning out the way that he did, there is a possibility of that. We don't have to find that there was no mitigation presented to determine prejudice, do we? No. But what I'm simply saying is that to balance the case fairly is to look at the case that was presented and to say, because, Your Honor, ultimately, and I need to get to this in light of the question you posed, I would submit that the struggle that you describe, the difficulty that you describe in assessing this, is because the standard is a reasonable probability. And where one can say that one lawyer might do it one way, but another lawyer did it a different way, and for prejudice purposes has plenty of reasons for doing it that way, that means that a different result is virtually always possible, but it's not probable. Does it make a difference that this is a capital case where the jury, however instructed, we all know, is perfectly free to reach either conclusion that it wants to? The jury is basically being asked to make a sentencing decision, the way judges are being asked to make sentencing decisions. And, you know, it's not do the guidelines apply. It's not do, you know, do we give a presumptive sentence. The jury is being basically told, although the instructions don't say this exactly is, you decide. We're not deciding. You decide. Does that make a difference? It does not legally. The question is, under Strickland, as in any other case, was it, can one say that, for example, to avoid the Jekyll and Hyde style claim, which is essentially what this is, plus the lingering doubt, and just go with the Hyde, that that's what any lawyer was obligated to do. And when counsel says, well, they're two separate trials. You go in with a given that he's committed the murders and the rape. Different lawyers can do that much differently, and a lawyer could reasonably say, just as Lanyon said, the expert. Now, he knows, I think, at least as much as any of us, hopefully, about child psychiatry. He said he's a psychopath, and it would be a mistake to offer any attempted mitigation on his behalf. That's what he says in the habeas proceeding. So would a jury potentially be interested in that? Would they be interested in a case in which the worst they can say, this is not the neglect of any prior case of this court, any of them, that have found that a significant mitigation case was overlooked? That his dental needs were neglected? That's not a good thing. It doesn't explain. Look, let's be fair. If we're going to take all the evidence favorable to the side asserting it, as you're asking us to do with your expert, we know he was regularly beaten by his father. We know that he was a drug user in addition to a drug seller. We know there are a number of things that might have gone to his ability to make rational decisions. Now, I don't know what a jury would do with that, but I must tell you, I've seen plenty of trials, capital trials, in which that kind of defense was presented, and I've seen some where it succeeded. Now, that's not a measure of reasonable probability to me. That's why I'm struggling with a measure. But I would add, Your Honor, that if we look at the universe, for example, of this court's cases, much less the Supreme Court's, you do see a magnitude of mitigation that is far beyond this case. And since I see that my time is running out, to the extent that those are intended to offer in terms of the psychology of the crime or the explanation for it, as has been indicated, this is an extraordinarily cunning crime. The fact that he identifies the home, commits a home invasion robbery, ties them both up, blindfolds them, rapes her, kills them both, only to get the keys. He knows he wants the keys to the store. He recruits others. They commit the nighttime burglary of the store. He wants to resell a lot of expensive equipment. That is not indicative of any of the kind of mitigating disorders that explain inexplicable crimes. This was a cunning and ruthless rape, robbery, and two murders. And I see I have 30 seconds, so I'll take Judge Olin's suggestion and not spend all my time. Very well.  Thank you, Your Honor. If I may very briefly. If part of the cunning was to get as much of the stary equipment as possible to make the money selling on the side, boy, this is one stupid kid. Well, we could stipulate that. Yeah. Well, the other defendants who were arrested for stealing the equipment got the bulk of it. He got roughly 8% of it. Winfrey had something like 80% of it. The other young man had 12%. Our client had 8%. Not too smart. Not too swift. The question that I think is left after counsel's argument is, who was going to make that kind of decision to introduce that evidence? Well, presumably, it would be somebody who knew what the evidence was and wasn't going to use it. There is no evidence that Walton knew the evidence. There was no investigation to determine what he was rejecting. There was no evidence at all. He failed. How does that go to the prejudice prong? It goes to the first prong of Strickland. It goes to the first prong. You've all assumed for purposes of argument, I must tell you, I think the first prong case, as the district court found, is quite strong. But how does it go to prejudice? My answer is the same, Your Honor. I'm going back. I was simply addressing his point. A good lawyer would have known how to use it. Yeah. If the court has questions, I'm happy to attempt. Thank you. Thank you, counsel. Thank you both, counsel, for your briefing and argument. It's very helpful in this case, old case, so it's good to have good lawyers. So I really appreciate both of your efforts here. This matter is submitted and we are adjourned.
judges: HURWITZ, OWENS, BENNETT